IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :          CIVIL ACTION
ex rel. SHAWN BATES et al.        :
                                  :
          v.                      :
                                  :
DENTSPLY INTERNATIONAL, INC.      :          NO. 12-7199

MEMORANDUM

Bartle, J.                                    September 4, 2014

          Plaintiffs-relators Shawn Bates, Edward Josefoski, and
Roberta Lesser ("relators") have sued defendant Dentsply
International, Inc. ("Dentsply") in this qui tam action on behalf
of the United States for violations of the False Claims Act
("FCA"), 31 U.S.C. § 3729, as well as on behalf of numerous
states and municipalities under their respective false claims
statutes.  Relators also include claims for conspiracy and
retaliation and under the Pennsylvania Whistleblower Law, 43 Pa.
Cons. Stat. Ann. § 1421.  Finally, two of the relators allege
wrongful termination under Pennsylvania law.

          Before the court is the motion of Dentsply to dismiss
relators' second amended complaint pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure for failure to state a
claim.

                              I.

          When ruling on a Rule 12(b)(6) motion to dismiss
generally, the court must accept as true all factual allegations
in the complaint and draw all inferences in the light most
favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515

F.3d 224, 233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim must do more than raise a "'mere possibility of misconduct.'"  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679).  Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 578.

Under Rule 9(b), if a complaint alleges fraud, "a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The purpose of Rule 9(b)'s particularity requirement is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).  To meet this burden, our Court of Appeals has explained that the complaint must supply "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'- that is, the 'who, what, when, where and how' of the events at issue."  In re Rockefeller Ctr. Props., Inc. Sec.

Litig., 311 F.3d 198, 217 (3d Cir. 2002) (quoting In re
Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1422 (3d Cir.
1997)).

However, as it pertains to allegations under the FCA,
our Court of Appeals recently concurred with the First, Fifth,
and Ninth Circuits in holding that it is sufficient for a
plaintiff to allege "particular details of a scheme to submit
false claims paired with reliable indicia that lead to a strong
inference that claims were actually submitted." Foglia v. Renal
Ventures Management, LLC, No. 12-4050, 2014 U.S. App. LEXIS
10549, *8 (3d Cir. June 6, 2014); contra United States ex rel.
Noah Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455-56
(4th Cir. 2013); United States ex rel. Bledsoe v. Cmty. Health
Sys., Inc., 501 F.3d 493, 510 (6th Cir. 2007).  The court
explained that requiring "'representative samples' of the alleged
fraudulent conduct, specifying the time, place, and content of
the acts and the identity of the actors" "would be 'one small
step shy of requiring production of actual documentation with the
complaint," and would "undermin[e] the FCA's effectiveness as a
tool to combat fraud against the United States. Id. at *7
(citing Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)
and Brief for the United States as Amicus Curiae at 10-11, United
States ex rel Noah Nathan v. Takeda Pharms. N. Am., Inc., Civil
Action No. 12-1349, 2014 WL 1271321 (2014)).

In Foglia, the qui tam plaintiff was a registered nurse
previously employed by the defendant, a dialysis care services
company.  The plaintiff alleged that the defendant violated the

-3-

FCA by falsely certifying that it was in compliance with state regulations regarding quality of care when it falsely submitted claims for reimbursement for the drug Zemplar and reused single-use Zemplar vials.  The trial court ruled that Foglia's claims must be dismissed because he failed to "provide a 'representative sample' or to 'identify representative samples of specific false claims made to the Government.'"  Id. at *3.  Our Court of Appeals, reversing the District Court's ruling, held that the more "nuanced" approach to Rule 9(b) followed by the First, Fifth, and Ninth Circuits was appropriate.  As such, Foglia provided sufficient facts to meet the requirements under Rules 9(b) and 12(b)(6) when he alleged that the defendant's inventory logs showed that less Zemplar was used than would be required if it were used in the single use fashion and that the defendant did not follow the proper procedures to reuse extra Zemplar from the already-opened vials.

## II.

We accept the following factual allegations contained in the second amended complaint as true and draw all inferences in the light most favorable to relators.

Defendant Dentsply is the world's largest designer, developer, manufacturer, and marketer of a broad range of professional dental products including laboratory and specialty products.  Dentsply serves a full array of dental product needs, including preventive, orthodontics, restorative, endodontics, prosthetics and implants.  Dentsply's net sales exceeded $2.5 billion in 2011.

-4-

Relator Shawn Bates was employed by Dentsply in its Implant Sales Division as a Senior Regional Sales Manager in Virginia.  Bates, a decorated military veteran, at all times maintained an excellent job performance rating.  In 2012, shortly after becoming a Senior Regional Sales Manager, Bates approached the company's management with concerns about the improper use of rewards and incentives to induce dental professionals to purchase Dentsply products.  In May, 2013, Bates was terminated by the company.

Relator Edward Josefoski was employed by Dentsply in its Implant Sales Division as a District Sales Manager in Pennsylvania.  At all times he maintained an excellent job performance rating.  In 2012 Josefoski reached out to the company's management to address certain concerns relating to inaccuracies in Dentsply's sales data.  In August, 2013, Josefoski resigned from his job.

Relator Roberta Lesser is currently employed by Dentsply.  She is in its Implant Sales Division as a District Sales Manager in Massachusetts.

The federal and state governments, through the Medicare and Medicaid programs, are among the principal purchasers of Dentsply's products.[1]  Numerous hospitals run by the United

---

1.  Relators allege that Medicaid provides dental coverage for persons under 21 years of age.  According to relators, Medicaid covers approximately 60% of eligible dental procedures for its beneficiaries.  In 2010, the number of children ages 1 to 20 who received preventive dental services through Medicaid rose to 13.6 million.  Meanwhile, the number of children ages 1 to 20 receiving dental treatment services rose to 7.6 million in 2010.

(continued...)

States Veterans Administration likewise buy products and goods
from Dentsply.  In fact, Dentsply has a division that is solely
dedicated to addressing government sales called the Dentsply
Federal Government Division.

        In June, 2013, a Dentsply manager circulated an email
which stated that the attached flyer featuring the entire
Dentsply portfolio of products would be circulated to 2,500
government contacts.  Relators allege that Dentsply has signed at
least hundreds of contracts with the United States government for
various products and services, including a recently-announced $35
million contract modification to provide general dental supplies
to the United States military.  According to relators, a large
proportion of dental patients for whom Dentsply products are used
are insured by Medicare, Medicaid, or other government-sponsored
programs.

        Relators maintain that in order to increase its
profits, Dentsply created a complex array of monetary incentives,
including cash payments, free travel, and other benefits, for
dental healthcare providers, such as dentists, who use its
products.  None of the incentives, according to relators, is
intended to produce, and none of them does produce, any
scientific information or research.  For example, the second
amended complaint asserts that a Dentsply promotional brochure

---

1.  (...continued)
Relators further assert that the Children's Health Insurance
Program ("CHIP"), which covers children from low-income families
who do not qualify for Medicaid, provides dental coverage.
Finally, Relators maintain that Medicare covers certain dental
procedures necessary to protect a patient's general health.

from October 2011 advertised to dental professionals that if they purchased 100 dental implants at full price from Dentsply, they would receive an all-expenses paid trip to a symposium in Hamburg, Germany.  Moreover, at least two dentists, whose practice treated patients receiving Medicare, Medicaid, and TriCare[2] benefits, qualified for the free trip after purchasing more than 100 implants.

Relators detail several other alleged schemes on the part of Dentsply to increase its market share such as the "2009 Steps to Success- Implant Specialist Referral Program" which gave healthcare providers $500 worth of dental equipment in exchange for purchasing a certain number of dental implants.

Relators reference internal Dentsply emails which discuss the company's inducements to dental professionals to purchase Dentsply products.  For example, a 2013 email from the vice president of Dentsply praised the sales management team for filling "VIP trips" with the "right customers and prospects." The email stated that the company would have "over 100 customers attending" the trips and that the customers would "be key to [the company's] growth."

Relators specifically describe incentive programs in Maryland, Pennsylvania, Ohio, and Virginia.  In Maryland, according to relators, Dentsply solicited business from Chevy Chase Endodontics, which treats patients who receive Medicare,

---

2.  Tricare is a health care program of the United States Department of Defense Military Health System.  Tricare provides civilian health benefits for military personnel, military retirees, and their dependents.

Medicaid and Tricare benefits.  Relators plead that the endodontists employed at Chevy Chase were targeted by salespeople through the "Regional Knight" program to become advocates for certain Dentsply products.  As a result, Chevy Chase purchased nearly $40,000 in products from Dentsply in exchange for numerous speaking opportunities for the individual endodontists.  Relators also allege that Chevy Chase requested reimbursement from government healthcare programs for products purchased from Dentsply.

In Pennsylvania, relators claim that Dentsply salespeople induced professionals at North Pittsburgh Oral Surgery ("NPOS") to purchase Dentsply products in exchange for paid speaking opportunities, tickets to local baseball games, and a VIP trip to Germany.  Moreover, relators discuss a quid pro quo relationship between Dentsply and North Pittsburgh Oral Surgery wherein Dentsply sponsored a charity golf tournament as well as a speaking event in exchange for sales of its products to the practice.  According to relators, NPOS treats patients that receive benefits from Medicaid, Medicare and Tricare.

Relators further allege that Dr. Wayne Roccia, a surgeon employed by the aforementioned NPOS, requested that Dentsply sponsor a golf tournament organized by Dr. Roccia's wife in exchange for purchasing dental implants from Dentsply.  Dr. Roccia also requested that Dentsply sponsor a lecture at the Pittsburgh Academy of Implantology.  Dentsply complied with the requests, and Dr. Roccia allegedly purchased $7,000 in dental implants from the company.  Meanwhile, Dentsply encouraged Dr.

Roccia to purchase dental implants for use on his patients at St. Elizabeth's Health Center in Youngstown, Ohio, where at least 45% of patients were covered by Medicaid.  Relators assert that Dentsply gave St. Elizabeth's thousands of dollars in free equipment and wined and dined Youngstown officials in order to induce them to provide more funding to St. Elizabeth's.  As a result, St. Elizabeth's used their increased funding to purchase $10,000 in Dentsply products.

Finally, relators allege that Dentsply improperly induced Dr. Louis Berman, a practitioner in Annapolis, Maryland who treats patients receiving Medicare and Medicaid benefits, to purchase Dentsply products by advertising a lucrative continuing education course taught by Dr. Berman and hosting him at another continuing education course in Northern Virginia.  An internal Dentsply report issued in mid-2012 stated that there was a 971% return on investment for Dentsply's sponsorship of the continuing education event in Virginia.

III.

We turn first to relators' allegations under the FCA in Counts I and II of the second amended complaint.  The primary purpose of the FCA "is to indemnify the government-through its restitutionary penalty provisions-against losses caused by a defendant's fraud." United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 304 (3d Cir. 2011) (citing Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001)).  In enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial

loss to the government.'" <u>Cook County v. United States ex rel.</u>
<u>Chandler</u>, 538 U.S. 119, 129 (2003) (citing <u>United States v.</u>
<u>Neifert-White Co.,</u> 390 U.S. 228, 232 (1968)).   A private
individual, known as a relator, may bring a civil action in the
name of the United States to enforce the FCA and may share a
percentage of any recovery resulting from the suit.   31 U.S.C. §
3730(b) & (d).

> A person is liable for a violation of the FCA if he or
she:

> > (A) knowingly presents, or <u>caused to be</u>
> > <u>presented</u>, a false or fraudulent claim for
> > payment or approval;
> > (B) knowingly makes, uses, or causes to be
> > made or used, a false record or statement
> > <u>material</u> to a false or fraudulent claim;
> > (C) conspires to commit a violation of
> > subparagraph (A),(B)...

31 U.S.C. § 3729(a)(1) (emphasis added).   In the context of the
FCA, "material" is defined as "having a natural tendency to
influence, or be capable of influencing, the payment or receipt
of money, or property."   31 U.S.C. § 3729(b)(4).   To be material,
the false or fraudulent statements need only have the "potential
to influence the government's decisions." <u>United States ex rel.</u>
<u>Thomas v. Siemens AG</u>, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014).

> There are two categories of false claims under the FCA:
a factually false claim and a legally false claim. <u>U.S. ex rel.</u>
<u>Conner v. Salina Reg'l Health Ctr., Inc.</u>, 543 F.3d 1211, 1217
(10th Cir. 2008).   A claim is factually false when the claimant
misrepresents the goods or services it provided to the
government.   A claim is legally false when the claimant knowingly

and falsely certifies that it has complied with a statute or regulation when the compliance is a condition for government payment.  Id.  A legally false FCA claim is based on a "false certification" theory of liability.  See Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), overruled in part on other grounds by U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928 (2009).

Further complicating the issue, there are two types of false certifications, express and implied.  Wilkins, 659 F.3d at 305.  Pursuant to the "express false certification" theory, a defendant is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to government payment in connection with the claim for payment of federal funds.  Id. (citing Rodriguez, 552 F.3d at 303). "Implied false certification" liability attaches when a claimant seeks and makes a claim for payment from the government without disclosing that it violated regulations that affected its eligibility for payment.  Id.  Thus, an implied false certification theory of liability is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."  Id. (citing Mikes, 274 F.3d at 699).

According to our Court of Appeals, the implied certification theory of liability "should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims under federally funded health care programs... 'because the [FCA] was

-11-

not designed for use as a blunt instrument to enforce compliance with all medical regulations - but rather only those regulations that are a precondition to payment....'" Wilkins, 659 F.3d at 307 (citing Mikes, 274 F.3d at 699).

Our Court of Appeals has also addressed the "caused to be" portion of 31 U.S.C. § 3729(a)(1)(A) and (B).  Prior to United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235 (3d Cir. 2004), it was unclear whether, under the FCA, a party that did not directly submit a fraudulent claim to the government, but rather knew that its conduct would cause another party to do so, could be held liable.  In that case, Schmidt, an orthopedic surgeon, alleged that Zimmer, a manufacturer of orthopedic implants, designed and implemented a marketing program that it knew to be in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and targeted health care providers that participated in the Medicare program.  Under the program, the health care providers were rewarded if they purchased Zimmer's products in sufficient numbers to increase Zimmer's share in the orthopedic implant market.  According to Schmidt, these rewards functioned as kickbacks.  Schmidt also alleged that the healthcare providers who received kickbacks from Zimmer submitted claims to the Medicare program without disclosing the rewards they received from Zimmer.

The Schmidt court held that, while there were no allegations that Zimmer itself made any certifications to the government or that Zimmer assisted the healthcare providers in preparing any such certifications, Schmidt sufficiently alleged

-12-

an FCA violation when he pleaded that Zimmer knew both that its

marketing practices violated the AKS and that the healthcare

providers it targeted would submit legally false claims to the

government as a result.  <u>Id.</u> at 245.  <u>Schmidt</u> is also instructive

with regard to the knowledge element of relators' FCA claims. The

court stated,

> Moreover, it is a <u>fair inference from the
> alleged facts regarding Zimmer's business and
> knowledge of the relevant market that
> Medicare participation was an important, if
> not an essential, characteristic of the
> Premier Participants</u>.  If Mercy and other
> Premier Participants were unable to maintain
> their eligibility to receive Medicare funds,
> the purpose of Zimmer's marketing scheme -
> selling as many of it implants as possible to
> Premier Participants - would be thwarted. We
> further regard it as a <u>fair inference from
> the facts alleged that Zimmer was aware</u> that
> Premier Participants could not maintain their
> eligibility for Medicare participation
> without certifying their compliance with
> federal health law.  Thus, when read in a
> light most favorable to Schmidt, <u>one can
> reasonably infer from the foregoing that
> Zimmer must have known</u> that Mercy could not
> purchase its implants, receive kickbacks, and
> share those kickbacks with its physicians, in
> the manner provided by the contract unless
> Mercy falsely certified itself to be in
> compliance with federal law.

<u>Id.</u> at 244 (emphasis added).  Thus, while Zimmer was not itself

submitting claims directly to the government or helping the

targeted healthcare providers to submit claims, the court found

it sufficient that the plaintiff alleged that the healthcare

providers were Medicare participants and that Zimmer must have

known that by inducing those providers to violate the AKS, it

would also be causing them to falsely certify compliance with

that law.

-13-

In Counts I and II of the second amended complaint
relators have invoked subparagraphs (A) and (B), respectively, of
31 U.S.C. § 3729(a)(1) against Dentsply.  Relators allege that,
under an implied certification theory, Dentsply violated the FCA
by causing dental providers to submit legally false claims to
government healthcare programs by providing bribes and kickbacks
to those dental providers in violation of the AKS.[3]  The AKS
prohibits any person from "knowingly and willfully solicit[ing]
or receiv[ing] any remuneration (including any kickback, bribe,
or rebate) directly or indirectly, overtly or covertly, in cash
or in kind..." to induce another to refer, purchase, or arrange
for the furnishing of a healthcare item or service reimbursable
under a federal healthcare program.  42 U.S.C. § 1320a-7b.
Compliance with the AKS is a precondition of payment under
Medicare and Medicaid.  Wilkins, 659 F.3d at 313.

Dentsply counters that the second amended complaint
fails to allege that claims for reimbursement for its products
were submitted to any government healthcare program or that any
of Dentsply's marketing practices were directed at providers that
submitted claims for government reimbursement.  According to
Dentsply, relators' use of the words "upon information and
belief" in their second amended complaint is insufficient to

---

3.  Relators do not allege any factually false claims, that is,
they do not claim that defendant misrepresented or caused to be
misrepresented the quality, nature, or quantity of any of its
products supplied to dental providers who submitted claims to
government healthcare programs.  The second amended complaint
also does not contain specific allegations of instances in which
Dentsply violated the FCA when it sold its products directly to
government entities.

assert that false claims were actually submitted to government
programs such as Medicare or Medicaid.  Dentsply also argues that
relators failed plausibly to allege that any false claims were
material to the government healthcare programs' decision to
reimburse providers for services.  Finally, Dentsply maintains
that relators have failed sufficiently to allege that Dentsply
had any knowledge that the dental providers targeted by its
marketing schemes served patients with government health
insurance.

Relators counter that, unlike the court in Foglia, we
are not faced with a "close case" because they have provided in-
depth allegations setting forth "particular details of a scheme
to submit false claims" and have also supported their allegations
with evidence that would allow the court to draw strong
inferences that false claims were actually submitted.  Relators
point to their allegations "upon information and belief" that the
providers identified in the second amended complaint treated
Medicare and Medicaid patients and to the more detailed
allegations regarding St. Elizabeth's Health Center and the
percentage of patients there receiving Medicaid insurance.
Relators also argue that materiality, that is, whether the
government would have paid the claims had it known about the
violation of the AKS, is an issue for the jury to decide.

Dentsply cites Zavala v. Wal-Mart Stores, Inc., 393 F.
Supp. 2d 295 (D. N.J. 2005) in support of its argument that "on
information and belief" is insufficient to allege facts under the
FCA, particularly the fact that dental providers targeted by

-15-

Dentsply submitted claims to Medicare, Medicaid or other government healthcare programs.  In Zavala, the court held that, in the context of a civil RICO action, see 18 U.S.C. § 1962(c) and (d), the phrase "on information and belief" in the complaint was insufficient to meet plaintiffs' pleading burden under Rule 9(b).  Zavala, 393 F. Supp. 2d at 313-314.  We find that case to be inapposite.  Here we have claims under the FCA, which, as noted previously, are treated differently for the purposes of Rule 9(b) than other types of fraud claims as stated by our Court of Appeals in Foglia.  Thus, the pleading standard for a civil RICO case is not instructive.

Relators point us to Weiner v. The Quaker Oats Co., 129 F.3d 310 (3d Cir. 1997).  There, the court, in reference to the pleading requirements of Rule 9(b), held that because "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs," where factual information is peculiarly within the defendant's control, Rule 9(b)'s requirements should be relaxed.  Here, the information regarding particular claims submitted by dental professionals to Medicare and Medicaid is peculiarly within the control of the government, which has chosen not to intervene, or the dental professionals themselves, who ostensibly have no interest in cooperating with relators.

We find Weiner to be more persuasive in this regard than Zavala.  Relators' allegations "under information and belief" with regard to Medicare and Medicaid claims as well as

their specific allegations with regard to St. Elizabeth's are
sufficient to meet their burden under Rule 9(b).

Turning to the issue of causation, while it is true
that the dental providers detailed in the second amended
complaint made the ultimate decision to file claims for
reimbursement from federal healthcare programs, that fact "is not
inconsistent with a conclusion that [Dentsply] caused that
filing." Schmidt, 386 F.3d at 244.  We also agree with relators
that they have sufficiently alleged that the falsity of the
claims was material to the government's decision to reimburse
healthcare providers for those claims.  As noted above, to be
material, the false or fraudulent statements need only have the
"potential to influence the government's decisions."  In our
view, falsely certifying compliance with a federal statute is
certainly material to the government healthcare program's
decision to reimburse a claim.

With regard to the knowledge requirement of the FCA, we
find the Schmidt case applicable here.  Like Dentsply, the
defendant in that matter was not itself submitting claims
directly to the government or helping the targeted healthcare
providers to submit claims, yet the court found it sufficient
that the plaintiff alleged that the healthcare providers were
Medicare participants and that the defendant must have known that
by inducing those providers to violate the AKS, it would also be
causing them falsely to certify compliance with that law.  Here,
it is undisputed that the Medicare and Medicaid programs pay out
huge sums, undoubtedly in the billions, to health care providers

each year.  Some of that, of course, is paid to dental
professionals.  Like the court in Schmidt, in our view it is a
fair inference from the facts alleged in the second amended
complaint that Dentsply knew that the dental providers it
targeted served at least some patients with government health
insurance, and that by offering those providers the rewards and
incentives alleged, Dentsply was causing the providers falsely to
certify compliance with the AKS.  Our conclusion is bolstered by
the allegations in the second amended complaint, detailed above,
regarding the number of children served by Medicaid and CHIP
dental coverage.  The fact that millions of children receive
dental coverage under those programs cannot have been a mystery
to a large, sophisticated healthcare corporation such as
Dentsply.

We thus conclude, based on Foglia, Wilkins, and
Schmidt, that Counts I and II of relators' second amended
complaint, to the extent they allege that Dentsply violated the
FCA by causing dental providers to submit to government
healthcare programs false certifications of compliance with the
AKS, state a claim upon which relief can be granted.  Whether
relators will be able to prove their case must await another day.


IV.

Relators also allege, in Count III of the second
amended complaint, that Dentsply violated the conspiracy
provision of the FCA, 31 U.S.C. § 3729(a)(3) and (a)(1)(C).
Relators state that "defendants entered into a conspiracy or

-18-

conspiracies to defraud the United States by getting false and fraudulent claims allowed or paid..." (emphasis added).  However, there is now only one defendant, Dentsply, in this action. Dentsply is correct that relators have not stated a claim for conspiracy because they failed to identify any co-conspirators in the second amended complaint and failed to allege an agreement, whether express or implied.  Twombly requires more than vague and conclusory allegations.  Despite the fact that relators have now had two opportunities to amend their complaint, they fail to specify who the alleged co-conspirators are in Count III. Relators urge the court to infer from the entirety of the complaint that the co-conspirators are the dental providers Dentsply targeted with kickback schemes.  We decline to do so and will dismiss Count III of the second amended complaint for failure to state a claim.

V.

We next turn to relators' claims in Counts XXXII through XXXVII for violations of the retaliation provisions of the FCA, violations of the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. Ann. § 1421, and wrongful termination under Pennsylvania common law.

In Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176 (3d Cir. 2001), our Court of Appeals held that in order for an employee to proceed with an employment retaliation claim under the FCA, the employee must allege that "(1) he engaged in 'protected conduct,' and (2) that he was discriminated against because of his 'protected conduct.'"  Id. at 186 (citing U.S. ex

-19-

rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998)).  For the second prong to be satisfied, a relator must allege that "(1) his employer had knowledge that he was engaged in 'protected conduct' and (2) his employer's retaliation was motivated, at least in part, by the employee's engaging in 'protected conduct.'"  Hutchins, 253 F.3d at 186.  A claim for retaliation under the FCA will not lie unless the employer has been put on notice of the "distinct possibility" of FCA litigation.  Id. at 188.

Dentsply argues that relators allege no facts to support the conclusion that Dentsply was aware that relators were acting in furtherance of an FCA action.  Relators maintain that both Bates and Josefoski brought their concerns to senior management at Dentsply and that they were later retaliated against and harassed specifically because of those concerns.

In our view, neither Bates nor Josefoski has sufficiently alleged that they put Dentsply on notice of the distinct possibility of FCA litigation.  While they expressed "concerns" to management about company practices, they do not allege that they ever used the terms "illegal," "unlawful," or "qui tam action," and never informed anyone at Dentsply that they intended to contact the government about false claims.  See Sefen ex rel. United States v. Animas Corp., Civil Action No. 10-2971, 2014 U.S. Dist. LEXIS 82304 (E.D. Pa. June 13, 2014).  As such, we will dismiss Counts XXXII and XXXV of the second amended complaint.

Relators Bates and Josefoski have also alleged violations of the Pennsylvania Whistleblower Law in regard to their termination by Dentsply.  We agree with Dentsply that the law does not apply to private employers.  See Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 112 n.5 (3d Cir. 2003); 43 Pa. Cons. Stat. Ann. § 1422.  As such, we will dismiss Counts XXXIII and XXXVI of the second amended complaint.

Relators further allege wrongful termination under Pennsylvania common law.  While "the general rule" in Pennsylvania "is that at-will employees may be terminated for any or no reason, courts have forbidden the firing of at-will employees when doing so would offend Pennsylvania's public policy."  Fraser, 352 F.3d at 111 (citing Geary v. U.S. Steel, 319 A.2d 174, 185 (Pa. 1974)).  However, the public policy exception to at-will employment is construed narrowly.  Id.  The Pennsylvania Superior Court has recognized three limited circumstances in which public policy will trump employment at-will.  "An employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."  See Hennessy v. Santiago, 708 A.2d 1269 (Pa. Super. Ct. 1998).  We agree with Dentsply that relators have not alleged that they were required to commit a crime, that they were prevented from complying with a statutorily imposed duty, or that Dentsply was specifically prohibited from

discharging relators by statute.  As such, Counts XXXIV and
XXXVII of the complaint will be dismissed.

VI.

Dentsply further moves to dismiss relators' state and
municipal law claims contained in Counts IV through XXXI of the
second amended complaint.  Relator has alleged violations of 28
state and municipal laws analogous to the federal False Claims
Act.[4]  Defendant argues that those state and municipal claims
must be dismissed for the same reasons relators' claims under the
FCA should be dismissed.  See U.S. ex rel. Grenadyor v. Ukranian

---

4.  In addition to the specific states discussed below,
defendants have moved to dismiss the following state law claims
to the extent the federal claims are dismissed:  California
False Claims Act, Cal. Gov't Code § 12651; City of Chicago False Claims
Act, Mun. Code § 1-22-010; New York City False Claims Act, Adm.
Code § 7-810; Colorado Medicaid False Claims Act, Rev. Stat.
§ 25.5-4-304; Connecticut False Claims Act, Chapter 319v § 17b-
301a; Delaware False Claims Act, Del. Code. Ann. tit. 6,
§ 1201;District of Columbia False Claims Act, D.C. Code § 2-
308.14; Florida False Claims Act, Fla. Stat. Ann. § 68.081;
Georgia False Medicaid Claims Act, Ga. Code. Ann. § 49-4-168;
Hawaii False Claims Act, Haw. Rev. Stat. § 61-22; Illinois
Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat.
175/1; Indiana False Claims and Whistleblower Protection, Burns
Ind. Code Ann. § 5-11-5.5-1; Louisiana Medical Assistance
Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1;
Massachusetts False Claims Act, Mass. Ann. Laws. ch. 12, § 5(A);
Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601;
Minnesota False Claims Act, Minn. Stat. § 15C.01; Montana False
Claims Act, Mont. Code Ann. § 17-8-401; Nevada False Claims Act,
Nev. Rev. Stat. § 357.010; New Jersey False Claims Act, N.J.
Stat. § 2A:32C-1; New Mexico Medicaid False Claims Act, N.M.
Stat. § 27-14-1; New York False Claims Act, N.Y. State Fin. Law.
§ 187; North Carolina False Claims Act, N.C. Gen. Stat. § 1-605;
Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1;
Tennessee False Claims Act, Tenn. Code § 4-18-101; Tennessee
Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181; Texas
Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001;
Virginia Fraud Against Taxpayers Act, Va. Code. Ann. § 8.01-
216.1; Wisconsin False Claims Act, Wis. Stat. § 20.931.

Vill. Pharm., Inc., No. 09-7891, 2013 WL 6009261, *6 (N.D. Ill. Nov. 7, 2013).

Other than "conclusory" references to state Medicaid programs relators do not attempt to connect any of Dentsply's purported conduct to any of the states or municipalities on whose behalf they seek to bring suit.  We agree with Dentsply that, having failed to allege location-specific facts in the second amended complaint, relators have not adequately pleaded claims under the state laws of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Texas, and Wisconsin and the municipal laws of the City of New York, the City of Chicago, and the District of Columbia.  We will therefore dismiss those 26 claims contained in Counts IV through XXVI and XXVII through XXXI.  As a result, we need not address the additional arguments of Dentsply related to the specific provisions of law in Colorado, Connecticut, Minnesota, and New Mexico.

While the second amended complaint includes references to specific fraudulent activity that occurred in Pennsylvania, Ohio, Maryland, and Virginia, Pennsylvania and Ohio do not have a law analogous to the FCA and any claims under the Maryland False Claims Act have been dismissed.[5]  We will thus address the only

---

5.  On April 14, 2014, we entered an order dismissing with prejudice all claims asserted on behalf of Maryland on the ground that the state of Maryland declined to intervene (Doc. #49).

state claim for which the second amended complaint sets out
state-specific conduct, Virginia.  As noted previously, relators
allege a scheme by Dentsply and Dr. Louis Berman.  While Dr.
Berman practiced in Maryland, relators allege that one of the
inducements used by Dentsply to encourage Dr. Berman to purchase
its products was a continuing education conference which took
place in Virginia.

     The Virginia Fraud Against Taxpayers Act ("VFATA"), Va.
Code. Ann. § 8.01-216.1, is based on the federal FCA.  Lewis v.
City of Alexandria, 756 S.E.2d 465, 479 n.4 (Va. 2014).  Virginia
courts look to the federal FCA for guidance in construing the
VFATA.  Id.  As such, for the reasons explained above in relation
to relators' FCA claims, we also find that relators have
sufficiently stated a claim under the VFATA and we will allow
that claim, contained in Count XXVII of the second amended
complaint, to go forward.